UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

AMERICAN BEVERAGE ASSOCIATION,

        Plaintiff,

v.

RICK SNYDER, in his official capacity as the
Governor of the State of Michigan; BILL
SCHUETTE, in his official capacity as the          Case No.  1:11-CV-195
Attorney General of the State of Michigan;
and ANDREW DILLON, in his official capacity    HON. GORDON J. QUIST
as the Treasurer of the State of Michigan,

        Defendants,

v.

MICHIGAN BEER & WINE WHOLESALERS
ASSOCIATION,

        Intervenor-Defendant.

_____/

## OPINION

      The question in this case is whether a Michigan statute designed to protect the State and Michigan beverage retailers and distributors from fraud, M.C.L. § 445.572a(10), is unconstitutional because it violates the dormant Commerce Clause.  For the reasons stated below, the undersigned holds that the statute does not, on its face, violate this clause because it is neither discriminatory nor extraterritorial.  This leaves open the issue of whether the burden on interstate commerce is clearly excessive in relation to the putative local benefits.  Defendants' equitable defenses relating to laches, unclean hands, and the appropriateness of a declaratory ruling are rejected.  Defendants claim that Plaintiff has failed to establish a right to injunctive relief is rejected at this point as it remains to be seen whether the burden imposed by the statute is clearly excessive in relation to the local benefits.

# I. BACKGROUND

Plaintiff, the American Beverage Association, is a non-profit association of the producers, marketers, distributors, and bottlers of virtually every non-alcoholic beverage sold in the United States. Plaintiff sued Governor Rick Snyder, Attorney General Bill Schuette, and Treasurer Andrew Dillon. By Order dated April 26, 2011, the Court permitted the Michigan Beer & Wine Wholesalers Association ("MBWWA") to intervene as a Defendant. Throughout this Opinion, the individual defendants and the MBWWA will be referred to collectively as "Defendants."

Michigan is one of ten "Bottle Bill" states.[1] Michigan's Bottle Bill, which was enacted in 1976, requires certain beverages[2] to be sold in returnable containers – meaning, a container "upon which a deposit of at least 10 cents has been paid, or is required to be paid upon the removal of the container from the sale or consumption area, and for which a refund of at least 10 cents in cash is payable." M.C.L. § 445.571(d). Consumers may obtain a refund of the deposit by returning the empty container to a retailer or to a reverse vending machine.[3] The retailers, in turn, may return the empty containers to beverage distributors or manufacturers to obtain the ten-cent refund. M.C.L. § 445.572(6).

Distributors and manufacturers who originate deposits must file reports each year with the Michigan Department of Treasury indicating the total deposits collected and total refunds paid. M.C.L. § 445.573a. As of 1989, a manufacturer or distributor who collects more in deposits than it pays out in refunds (i.e., an "underredeemer") must annually escheat to the State the value of any

---

[1] The other Bottle Bill states are: California, Connecticut, Hawaii, Iowa, Maine, Massachusetts, New York, Oregon, and Vermont. *See* http://www.bottlebill.org/legislation/usa.htm (last visited May 17, 2011).

[2] "Beverage" is defined as "a soft drink, soda water, carbonated natural or mineral water, or other nonalcoholic carbonated drink; beer, ale, or other malt drink of whatever alcoholic content; or a mixed wine drink or mixed spirit drink." M.C.L. § 445.571(a).

[3] A "reverse vending machine" is defined as "a device designed to properly identify and process empty beverage containers and provide a means for a deposit refund on returnable containers." M.C.L. § 445.572a(12)(j).

unredeemed deposits. M.C.L. §§ 445.573b(2), (5). Most of the escheated money is used for cleanup and redevelopment, with the remainder going to retailers to assist with handling costs. M.C.L. § 445.573c. When a distributor or manufacturer pays out more in refunds than it collects in deposits (i.e., an "overredeemer"), not only does the State lose its escheat revenue, but the distributor or manufacturer may suffer a direct financial loss.

One cause of overredemption is individuals redeeming containers in Michigan that were purchased outside of the State. To combat such fraudulent redemption, in 1998 the Michigan Legislature criminalized the redemption of containers by a person who knows or should have known that no deposit was paid and began requiring retailers to post a notice to that effect. *See* M.C.L. §§ 445.574a, 445.574b. Then, in 2008, the Bottle Bill was amended to criminalize the knowing acceptance of such containers by dealers and distributors, M.C.L. § 445.574a, and to include the provision that is challenged here – the unique-mark requirement, M.C.L. § 445.572a(10).

Under the 2008 Amendment, all brands that have sales exceeding certain specified thresholds must include on their bottles a "symbol, mark or other distinguishing characteristic" that is unique to Michigan so as to permit reverse vending machines to identify the container as having been sold in the State. *See* M.C.L. § 445.572a. In its entirety, the challenged provision reads as follows:

> A symbol, mark, or other distinguishing characteristic that is placed on a designated metal container, designated glass container, or designated plastic container by a manufacturer to allow a reverse vending machine to determine if that container is a returnable container must be unique to this state, or used only in this state and 1 or more other states that have laws substantially similar to this act.

M.C.L. § 445.572a(10). The Amendment does not define "substantially similar," but Defendants assert that its common understanding includes all Bottle Bill states, even those where the deposit is less than Michigan's. Failure to comply is a misdemeanor punishable by imprisonment for not more than 180 days or a fine of not more than $2,000.00 or both. M.C.L. § 445.572a(11). The

3

Amendment became law in December of 2008, but its effective date was contingent upon the appropriation of at least 1 million dollars into an antifraud fund to retrofit reverse vending machines to read the unique marks § 572a(10) requires. That appropriation did not occur until nearly a year after the Amendment was signed. In addition, in order to accommodate technological issues that manufacturers might encounter, the unique-mark requirement did not go into effect until 90 or 450 days after the Amendment's effective date, depending on the type of container. M.C.L. § 445.572a(1)-(9).

Compliance with the unique-mark provision is only required of those brands whose sales meet certain specified thresholds. *See* M.C.L. 445.572a. For brands of non-alcoholic beverages that are sold in 12-ounce metal or glass containers, or in 20-ounce plastic containers, compliance is required if at least 500,000 cases were sold in the State, or if that brand was overredeemed by more than 600,000 containers, in the preceding year. *See* M.C.L. § 445.572a(1),(3), and (5). Due to the high threshold levels that trigger coverage, therefore, not all beverages must comply. For example, for 12-ounce metal containers, the non-alcoholic beverages subject to the provision are: Coca-Cola, Diet Coke, Caffeine Free Diet Coke, Sprite, Coke Zero, Cherry Coke, Pepsi, Diet Pepsi, Mountain Dew, Diet Mountain Dew, Diet Caffeine Free Pepsi, A & W, Dr. Pepper, and Vernors. (Def.'s Resp. at 4, Ex. 8.) The manufacturers of most of these beverages have been complying with the law for approximately one year. By way of illustration, Coca-Cola Enterprises is placing two parallel lines of dots centered between the date and manufacturing number on the bottom of its 12-ounce cans. (Def.'s Resp. Ex. 9.) Dr. Pepper and A &W did not meet the thresholds until more recently.

Some of Plaintiff's members, either individually or through their membership in the Michigan Soft Drink Association ("MSDA"), participated in the legislative process leading to the 2008 Amendment. The MSDA informed Plaintiff regarding the introduction and passage of the

4

unique-mark requirement, but Plaintiff neither directed nor controlled the MSDA's activities relating to the legislation, nor did Plaintiff itself directly participate in the legislative process.  (Def.'s Resp. at 5, Pl.'s Reply at 13 and Ex. E.)  The MSDA fervently opposed statutorily mandating unique-to-Michigan marking, especially because some industry members were already voluntarily experimenting with such marking on cans, but the technology had not yet been perfected.  (Def.'s Resp. Ex. 7A.)

In this case, Plaintiff asserts that the unique-mark requirement violates the Commerce Clause by (1) discriminating against interstate commerce, (2) regulating commerce occurring entirely outside of the State, and (3) imposing a burden on interstate commerce in excess of the provision's putative local benefits.

## II. Motion Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are facts which are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### III. ANALYSIS

#### A. Affirmative Defenses

As an initial matter, Defendants assert that Plaintiff's claim is barred by the equitable doctrines of laches and unclean hands, that Plaintiff has failed to meet the standard for declaratory relief, and that Plaintiff's claim for injunctive relief should be dismissed because the circumstances do not warrant the extraordinary grant of equitable relief.

##### 1. Laches

"A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Chirco v. Crosswinds Cmtys., Inc.*, 474 F.3d 227, 231 (6th Cir. 2007). Defendants argue that Plaintiff unreasonably delayed bringing this case because the beverage industry actively participated in the legislative discussions leading to the 2008 Amendment, the Amendment itself already contained a delayed timetable for compliance (i.e., the 90 and 450 day periods), and yet, Plaintiff waited more than two years after enactment to file this case. As to prejudice, Defendants note that in addition to the time and money spent on the legislative process, the legislature has already appropriated $1.5 million to retrofit reverse-vending machines and, unlike industry members who can recoup their costs through sales, the State has no similar opportunity.

Plaintiff argues that Defendants' laches claim must fail because it filed this case within the three-year statute of limitations period applicable to suits under 42 U.S.C. § 1983. *See Wolfe v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005); M.C.L. § 600.5805(10) (three-year limitations period for injuries to property). Moreover, Plaintiff notes, it was not obligated to bring suit before the law was enacted, so the time and money spent on the legislative process is irrelevant. As to the money appropriated to retrofit reverse vending machines, that investment would have been needed anyway in order to comply with the industry's own voluntary marking efforts.

"[I]n this Circuit, there is a strong presumption that a plaintiff's delay is reasonable so long as the analogous statute of limitations has not elapsed." *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991).  Where, as here, the defendant has not claimed that the statute of limitations has run, it must articulate "compelling reasons" in support of its laches claim. *Id.*; *see also Chirco*, 474 F.3d at 233 ("Only rarely should laches bar a case before the . . . statute has run.") (quoting *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir. 1985)).  The Court finds that Defendants' stated reasons do not meet this standard and laches does not apply.

### 2.  Unclean Hands

Defendants assert that Plaintiff did not act in good faith because, although its members participated in crafting the 2008 Amendment, they did not mention the "cataclysmic consequences" Plaintiff now forecasts.  Even though some of Plaintiff's members may have participated in the legislative discussions, Plaintiff did not.  In addition, the members who did participate "fervently opposed" the legislation even if not to the same extent as Plaintiff does here.  (*See* Def.'s Reply Ex. 7A., Pl.'s Mot. for Summ. J. Ex. K at 15.)  Therefore, the Court rejects this claim.

### 3.  Declaratory Relief

For the same reasons raised with regard to laches and unclean hands, Defendants claim that the Court should decline to issue a declaratory ruling.  The Court disagrees.  The Sixth Circuit has identified six criteria to consider in whether a declaratory ruling is appropriate, *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984), none of which counter against exercising jurisdiction under the circumstances presented here.

### 4.  Appropriateness of Injunctive Relief

Finally, Defendants argue that Plaintiff has not met its burden of establishing a right to injunctive relief.  "A party is entitled to a permanent injunction if it can establish that it suffered a

7

constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law." *Wedgewood Ltd. P'ship I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010). As set forth below, the Court finds that the challenged provision is neither discriminatory nor extraterritorial and, thus, Plaintiff has not established its entitlement to a permanent injunction on either of those bases. *Id.* However, because it remains to be seen whether the burden on interstate commerce is clearly excessive in relation to its putative local benefits, the Court rejects Defendants' argument as to the appropriateness of injunctive relief at this time.

**B. Commerce Clause**

The Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010) (quoting *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87, 104 S. Ct. 2237, 2240 (1984)). "In this 'dormant' form, the Commerce Clause limits the power of states 'to erect barriers against interstate trade.'" *Id.*

The Sixth Circuit has recently explained that dormant Commerce Clause claims involve a two-step analysis. *Id.* at 645-46. The first step is to determine whether the state regulation is either discriminatory or extraterritorial, in which case it is "virtually *per se* invalid," *id.* at 646, and "will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives," *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338, 128 S. Ct. 1801, 1808 (2008) (internal citations omitted). If it is neither discriminatory nor extraterritorial, then the court must apply the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.

Ct. 844 (1970), under which the state regulation must be upheld "unless the burden it imposes upon interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *Boggs.* 622 F.3d at 645-46. "'[T]he critical consideration' in any dormant Commerce Clause analysis 'is the overall effect of the statute on both local and interstate activity."   *Id.* at 646 (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S. Ct. 2080, 2084 (1986)).

### 1.  Whether the Unique-Mark Requirement is "Virtually Per Se Invalid"

#### a.  The Unique-Mark Requirement is not Discriminatory

The Supreme Court has explained that a state statute is discriminatory if it "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests." *Brown-Forman*, 476 U.S. at 579, 106 S. Ct. at 2084.  This inquiry, therefore, asks whether the regulation has a direct effect, or only an incidental effect, on interstate commerce.  *Boggs*, 622 F.3d at 644.  However, "[w]hat counts as a 'direct' burden on interstate commerce has long been a matter of difficulty for courts, and, presumably due to its questionable value as an analytical device, the 'direct/incidental' distinction has fallen out of use in dormant commerce clause analysis." *Id.*  Instead, the Sixth Circuit recently reformulated the issue as follows: "The first prong targets the core concern of the dormant commerce clause, protectionism-that is, differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *Id.* at 644-645 (quoting *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 449 (6th Cir. 2009)).  A law may discriminate against out-of-state interests "either facially, purposefully, or in practical effect."  *Tenn. Scrap Recyclers Ass'n*, 556 F.3d at 450.

Plaintiff argues that the unique-mark requirement is "stark, on-its-face, outright, and purposeful" discrimination against interstate commerce because  interstate beverage manufacturers – and only *inter*state beverage manufacturers – are the exclusive targets of the law.  This is so, Plaintiff asserts, both because the high volume levels that trigger coverage implicate only national

companies and because Michigan beverage companies that sell only in-state – by default – produce a Michigan-unique product. The law, Plaintiff argues, creates a financial disincentive for companies doing business in Michigan to engage in interstate commerce because to do so they must make and distribute cans of "Coke Michigan" and "Coke Rest of the United States," which increases production, material, storage and transportation costs. For example, Plaintiff's members utilize warehouse delivery systems, under which products are shipped from the manufacturing site to a warehouse, where they are stored until distribution to individual retailers. One warehouse may serve multiple states. Segregating products by state requires the development and tracking of dual inventory systems for the same products and necessitates the use of additional and costly warehouse space. Moreover, Plaintiff asserts, swift, unanticipated changes in demand are common in the beverage industry and manufacturers must often shift products between distribution sites or across state lines to meet demand. Yet, because "Coke Michigan" cans cannot be replaced with "Coke Rest of the United States" cans, manufacturers can no longer fluidly shift their distribution across state lines to meet demand. They may even be required to halt production at a plant that produces "rest of the United States" products to set up temporary Michigan-only production lines or vice versa.

Defendants contend that the unique-mark requirement is not facially discriminatory because, by its plain terms, it applies to all designated beverages, whether originating in-state or out-of-state. The purpose of the law is to combat fraudulent redemption, not to protect local economic interests or burden out-of-state beverage manufacturers. And the statute does not discriminate in effect because it evenhandedly requires all those who sell certain amounts of beverages in Michigan to use a unique-to-Michigan mark, without regard to the products' in-state or out-of-state origins. Any costs associated with producing the unique-to-Michigan mark are the same for both Michigan-based and out-of-state manufacturers.

## 1. Facial Discrimination

The parties differ in way they frame the issue of whether the statute is facially discriminatory. Defendants would have the Court consider only whether the statute facially discriminates between in-state and out-of-state manufacturers and, because the statute itself makes no overt distinction between the two, it is not facially discriminatory. An in-state manufacturer, just like an out-of-state manufacturer, must comply with the law if it meets the designated threshold levels. *See e.g.*, *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 442 (6th Cir. 2000) ("Whether a remanufacturer is located within the state of Ohio or outside of it, it must comply with the statute's requirements to obtain a license." ); *Minn. v. Clover Leaf Creamery Co*., 449 U.S. 456, 471-72, 101 S. Ct. 715, 728 (1981) ("Minnesota's statute does not effect 'simple protectionism,' but 'regulates evenhandedly' by prohibiting all milk retailers from selling their products in plastic, nonreturnable milk containers, without regard to whether the milk, the containers, or the sellers are from outside the State.").

Plaintiff, on the other hand, would have the Court look, not to whether the statute distinguishes between in-state and out-of-state manufacturers, but between manufacturers who deal in interstate commerce and those who do not. In support, Plaintiff relies on *Healy v. Beer Institute*, 491 U.S. 324, 109 S. Ct. 2491 (1989). At issue in *Healy* was a Connecticut statute that required out-of-state shippers of beer to affirm that their posted prices for products sold to Connecticut wholesalers were, at the moment of posting, no higher than the prices at which those products were sold in bordering states. *Id.* at 326, 109 S. Ct. at 2494. The Court first found, as it has in other cases challenging price-affirmation statutes under the dormant Commerce Clause, that the statute had an impermissible extraterritorial effect. *Id.* at 335-340, 109 S. Ct. at 2499-2501. The Court went on, however, to hold that the statute violated the Commerce Clause in a second respect:

> On its face, the statute discriminates against brewers and shippers of beer engaged in interstate commerce. In its previous decisions, this Court has followed a consistent practice of striking down state statutes that clearly discriminate against interstate commerce, *see, e.g.*, *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988); *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982); *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980), unless that discrimination is demonstrably justified by a valid factor unrelated to economic protectionism, *see, e.g.*, *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). By its plain terms, the Connecticut affirmation statute applies solely to interstate brewers or shippers of beer, that is, either Connecticut brewers who sell both in Connecticut and in at least one border State or out-of-state shippers who sell both in Connecticut and in at least one border State. Under the statute, a manufacturer or shipper of beer is free to charge wholesalers within Connecticut whatever price it might choose so long as that manufacturer or shipper does not sell its beer in a border State. This discriminatory treatment establishes a substantial disincentive for companies doing business in Connecticut to engage in interstate commerce, essentially penalizing Connecticut brewers if they seek border-state markets and out-of-state shippers if they choose to sell both in Connecticut and in a border State.

*Id.* at 340-41, 109 S. Ct. at 2501-02.

Like *Healy*, Plaintiff asserts, the unique-mark requirement affects only those who engage in interstate commerce – either Michigan manufacturers who sell both in Michigan and at least one other state or out-of-state manufacturers who sell in Michigan and at least one other state. A manufacturer who sells beverages solely within the state of Michigan, by default, already complies with the law. Moreover, Plaintiff adds, the statute imposes an economic disincentive for those doing business in Michigan to engage in interstate commerce by essentially penalizing Michigan manufacturers if they seek out-of-state markets and out-of-state manufacturers if they seek to do business both in Michigan and another state because only then must they incur the cost of producing, storing, and distributing "Coke Michigan" and "Coke rest of the United States."

The Court finds that Defendants have the best of this argument. First, by its plain terms, the unique-mark requirement applies to all beverage manufacturers who meet the specified thresholds regardless of their in-state or out-of-state origins. Contrary to Plaintiff's assertion, even a wholly

intrastate manufacturer must have a "symbol, mark, or other distinguishing characteristic" on its bottles – be it a unique UPC code or other mark – so as to permit reverse vending machines to identify it as having been sold in the State.  M.C.L. § 445.572a(10).  But more importantly, Plaintiff's rationale would by extension bar all state labeling requirements.  That is, any manufacturer who deals solely intrastate has an advantage over interstate manufacturers because it need comply with only one state's labeling requirements.  To hold that the unique-mark requirement is facially discriminatory, and therefore *per se* invalid, simply because it imposes a greater burden on those engaged in interstate commerce than those who do not would, in effect, mean that every state labeling restriction is unconstitutional.  However, "[n]egatively affecting interstate commerce is not the same as discriminating against interstate commerce." *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 794 (8th Cir. 1995).  In a Commerce Clause context, "discrimination" is defined as the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.*  (citing *Oregon Waste Sys. Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 99, 114 S. Ct. 1345, 1350 (1994)); *see also E. Ky. Res. v. Fiscal Court of Magoffin Cnty.*, 127 F.3d 532, 541 (6th Cir. 1997) (same).  The unique-mark requirement does not favor in-state manufacturers or disfavor out-of-state manufacturers; regardless of the bottle's point of origin, it must contain a "symbol, mark, or other distinguishing characteristic" that is unique to Michigan. M.C.L. § 445.572a(10).

## 2. Discriminatory Effect

Like a statute that is discriminatory on its face, a statute has a "discriminatory effect," for Commerce Clause purposes, if it "favors in-state economic interests while burdening out-of-state interests." *E. Ky. Res.*, 127 F.3d at 543.  Thus, the Sixth Circuit has explained, "there are two complementary components to a claim that a statute has a discriminatory effect on interstate

13

commerce: the claimant must show both how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation." *Id.; see also Boggs*, 622 F.3d at 648.

For example, in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S. Ct. 2434 (1977), the Supreme Court found unconstitutional a North Carolina statute that required "all closed containers of apples sold, offered for sale, or shipped into the State to bear 'no grade other than the applicable U.S. grade or standard.'" *Id.* at 335, 97 S. Ct. at 2437.  Although the statute was facially neutral, it discriminated against interstate commerce in practical effect for a number of reasons: (1) it increased the cost of doing business in North Carolina for Washington apple growers and dealers, who would have to incur the costs of changing or relabeling their containers to remove Washington's grades, while leaving North Carolina growers unaffected because they were not forced to alter their marketing practices in a similar way – they could use the USDA grade or none at all, just as they had prior to the statute's enactment; (2) it stripped away from Washington growers and dealers the competitive and economic advantage they had earned through Washington's expensive inspection and grading system, and, because it had no similar impact on North Carolina growers, it operated to their benefit; and (3) it essentially required Washington growers to downgrade their apples to the inferior USDA grades, which also worked to the advantage of North Carolina growers, whose apples were of inferior quality.  *Id.* at 350-52, 97 S. Ct. at 2445-46.

On the other hand, in *International Dairy Association v. Boggs*, the Sixth Circuit upheld an Ohio regulation that prohibited dairy processors from making claims about the absence of rbST, an artificial hormone given to lactating cows, in their milk products and required them to include a disclaimer when making such claims about their production processes.  622 F.3d at 632.  The court rejected the argument that the regulation was discriminatory in effect, explaining that the rule burdened Ohio dairy farmers who do not use rbST in their production of milk to the same extent it

burdened out-of-state farmers who do not use rbST.  *Id.* at 649.  Thus, the plaintiffs had not demonstrated that the regulation favored Ohio actors at the expense of out-of-state actors.  *Id.*

Contrary to Plaintiff's assertion, the circumstances presented here are more akin to *Boggs* than to *Hunt*.  In *Hunt*, the North Carolina statute required Washington growers to downgrade their apples and essentially lose the competitive advantage of their superior grading system. Simultaneously, the North Carolina statute benefitted North Carolina growers, whose apples were of inferior quality.  Michigan's unique-mark statute, on the other hand, does not strip out-of-state actors of any competitive edge to the benefit of in-state actors.  And like *Boggs*, the unique-mark requirement burdens in-state beverage manufacturers who meet the designated thresholds to the same extent it burdens out-of-state manufacturers who meet the designated thresholds.  Even if the threshold levels that trigger coverage implicate only high-volume, national companies like Coca Cola, small-volume out-of-state companies, just like small-volume in-state companies, are exempt.

In short, Plaintiff has not shown how "local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation."  *Boggs*, 622 F.3d at 648.

### 3.  Discriminatory Purpose

"It is axiomatic that a state law that purposefully discriminates against out-of-state interests is unconstitutional." *E. Ky. Res.*, 127 F.3d at 541.  Plaintiff argues that the purpose behind the statute is to increase the state's escheat revenue, while Defendants argue that it is to prevent fraudulent redemption.  In either case, however, there is nothing that indicates that Michigan is attempting to benefit local economic actors at the expense of out-of-state actors.  *See Boggs*, 622 F.3d at 648.  The unique-mark requirement applies to all beverage manufacturers who meet the thresholds regardless of their in-state or out-of-state origins.

15

### b.  The Unique-Mark Requirement is not Extraterritorial

In addition to regulations that are protectionist, there is second type of regulation which the Supreme Court has recognized as virtually *per se* invalid: "a regulation that has the practical effect of controlling commerce that occurs entirely outside of the state in question." *Boggs*, 622 F.3d at 645.  "The Commerce Clause 'precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State.'"  *Id.*  (citing *Healy*, 491 U.S. at 336, 109 S. Ct. at 2499).  The critical inquiry in determining whether a statute is extraterritorial is "whether the practical effect of the regulation is to control conduct beyond the boundaries of the State."  *Healy*, 491 U.S. at 336, 109 S. Ct. at 2499.  In analyzing the "practical effect" of the statute, the court must consider not only the consequences of the statute itself, but also "how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation."  *Id.*

The Supreme Court has struck down regulations on extraterritoriality grounds in the context of price-affirmation statutes.  In *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 106 S. Ct. 2080 (1986), the Supreme Court struck down a New York statute that required every liquor distiller or producer selling to wholesalers within the state to affirm that the prices charged were no higher than the lowest price at which the same product was sold in any other state during the month of affirmation.  *Id.* at 576, 106 S. Ct. at 2082.  The Court explained that the statute had an impermissible extraterritorial effect because, once a distiller posted its prices in New York, it was no longer free to change its prices elsewhere in the United States during the relevant month, at least without the approval of the New York State Liquor Authority.  *Id.* at 582-83, 106 S. Ct. at 2086.  "Forcing a merchant to seek regulatory approval in one State before undertaking a

16

transaction in another directly regulates interstate commerce." *Id.* at 582, 106 S. Ct. at 2086. Although New York was free to regulate the sale of liquor within its own borders and to seek low prices for its residents, it was not free to "'project its legislation into [other States] by regulating the price to paid' for liquor in those States." *Id.* at 582-83, 106 S. Ct. at 2086. Moreover, the Court explained, because of the recent proliferation in price-affirmation statutes, the likelihood that a seller would be subjected to inconsistent obligations in different states was high. *Id.* at 583, 106 S. Ct. 2086.

Similarly, in *Healy* the Supreme Court struck down a Connecticut statute that required out-of-state shippers of beer to affirm that their posted prices for products sold to Connecticut wholesalers were, at the moment of posting, no higher than the prices at which those products were sold in bordering states. *Id.* at 326, 109 S. Ct. at 2494. Like the statute in *Brown-Forman*, the Connecticut statute had the extraterritorial effect of "requir[ing] out-of-state shippers to forgo the implementation of competitive pricing schemes in out-of-state markets because those pricing decisions are imported by statute into the Connecticut market regardless of local competitive conditions." *Id.* at 339, 109 S. Ct. at 2501. As it had in *Brown-Forman*, the Court also explained that "States may not deprive businesses and consumers in other States of 'whatever competitive advantages they may possess' based on the conditions of the local market." *Id.*

Although the Supreme Court has not addressed an extraterritorial challenge to a product labeling restriction as presented here, the Sixth and Second Circuits have. *See Boggs*, *supra*; *Nat. Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001). In *Boggs*, the plaintiff argued that due to the complex national distribution channels through which milk products are delivered and the costs associated with changing their labels, the Ohio regulation effectively forced the plaintiff's members to create a nationwide label in accordance with Ohio's requirements. 622 F.3d at 647. The Sixth Circuit rejected this argument explaining:

17

> [U]nlike the price-affirmation statues [in *Brown-Forman* and *Healy*], which directly
> tied their pricing requirements to the prices charged by the distillers in other states,
> the Ohio Rule's labeling requirements have no direct effect on the Processor's out-
> of-state labeling conduct.  That is to say, how the Processors label their products in
> Ohio has no bearing on how they are required to label their products in other states
> (or vice versa).

*Id.*  In addition, compliance with Ohio's rule did not raise the possibility that processors would be in violation of other state's regulations, which, the court noted, was the key problem in *Brown-Forman*.  *Id.*

In *Sorrell*, the Second Circuit rejected a similar extraterritoriality argument regarding a Vermont statute that required mercury-containing products to be labeled so as to inform consumers that the products contain mercury and, on disposal, should be recycled or disposed of as hazardous waste.  272 F.3d at 106.  The plaintiff argued that given the manufacturing and distribution systems used by its members, who manufactured mercury-containing lamps,  if they were to continue selling in Vermont, they would be forced to also label lamps sold in every other state.  *Id.* at 110.  The court explained:

> Unlike the restrictions in the Supreme Court's price-regulation cases, the statute here
> makes no mention of other states for any purpose.  To the extent the statute may be
> said to "require" labels on lamps sold outside Vermont, then, it is only because the
> manufacturers are unwilling to modify their production and distribution systems to
> differentiate between Vermont-bound and non-Vermont-bound lamps.

*Id.* (internal citation omitted).  The manufacturers could simply pass on any increased Vermont compliance costs with  higher prices to Vermont consumers.  *Id.*  They were not required to adhere to the Vermont rule in other states.  *Id.* at 111.

Plaintiff argues that the unique-mark requirement directly regulates the labeling and sale of beverages in other states by making it a crime to use the same label in any non-Bottle Bill state.  The unique-mark requirement is, Plaintiff says, therefore, distinguishable from the state labeling requirements in *Boggs* and *Sorrell*, which did not ban the out-of-state sale of similarly packaged

products.  Morever, if Michigan can require unique-to-the-state labeling, so can every other state in the nation, and for any other product, which, Plaintiff asserts, would shatter the interstate economy.  Finally, Plaintiff adds, the fact that bottles with the mark § 572a(10) requires may also be used in states with "substantially similar" laws only compounds the constitutional problem because Michigan cannot force its judgment as to the proper method for handling empty beverage containers onto other states.

Defendants distinguish *Healy* and *Brown-Forman* by asserting that the unique-mark requirement will never cause beverages to be in violation of the regulations of other states because it does not govern how beverages are labeled in other states, only how they are labeled within Michigan.  And, Defendants note, that labeling does not depend on, or exclude, other identifying marks that might be required in non-Bottle Bill States.  Finally, if other states adopted similar laws, Defendants explain, it would not shatter the interstate economy, but instead eliminate the dilemma of which Plaintiff complains because the same mark could be used in any state that did so.

The Court notes that the unique-mark requirement presents an unusual extraterritoriality question.  It is distinguishable from the labeling requirements that were upheld in *Boggs* and *Sorrell* in that neither of those statutes prevented manufacturers from using the same label in other states.  However, it is also distinguishable from the price-affirmation statutes in *Healy* and *Brown-Forman* because it does not directly control conduct occurring wholly outside the State's borders.  That is, manufacturers are free to label their products however they see fit in other states.  They simply must label their bottles differently for sale in Michigan.  The Court recognizes that if a manufacturer must use a unique-mark for bottle law states, Michigan law would dictate what the label in a non-bottle state could not contain, i.e. a "unique mark" enabling machines to recognize containers not sold in Michigan.  Nonetheless, the Court believes that Defendants have the better side of the argument.

19

First, the scope of the extraterritoriality doctrine is not entirely clear as the Supreme Court has only struck down statutes based on their extraterritorial effects in cases involving price-affirmation statutes or statutes that "force an out of state merchant to seek regulatory approval in one State before undertaking a transaction in another." *Healy*, 491 U.S. at 336-37, 109 S. Ct. at 2499-2450 (summarizing the Court's extraterritoriality doctrine jurisprudence); *see also IMS Health Inc. v. Mills*, 616 F.3d 7, 30 (1st Cir. 2010) ("The Supreme Court has applied the so-called extraterritoriality doctrine sparingly."). In fact, the Supreme Court has previously rejected an extraterritoriality argument against a state statute that regulated out-of-state commercial transactions, but which, as here, had a clear in-state nexus and impact. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88-93, 107 S. Ct. 1637, 1649-52 (1987) (upholding an Indiana statute that limited out-of-state tender offerors' acquisition of controlling shares in certain Indiana corporations and noting "every application of the Indiana Act will affect a substantial number of Indiana residents, whom Indiana indisputably has an interest in protecting").

The statutes the Supreme Court has invalidated on extraterritoriality grounds also raised independent concerns about protectionism. *IMS Health Inc.*, 616 F.3d at 31 n.30*; see Brown-Forman*, 476 U.S. at 580, 106 S. Ct. at 2085 ("While a state may seek lower prices for its consumers, it may not insist that producers or consumers in other States surrender whatever competitive advantages they may possess."); *Healy*, 491 U.S. at 339, 109 S. Ct. at 2501 (same). As set forth above, the unique mark requirement does not involve protectionist concerns because both in-state and out-of-state manufacturers are equally burdened.

Perhaps most importantly, Plaintiff's extraterritoriality argument can be, and was, framed in terms of inconsistent regulations. That is, the danger here is that other or all states may impose their own unique-to-the-state packaging requirements for any product. However, "[i]t is not enough

to point to a risk of conflicting regulatory regimes in multiple states; there must be a conflict between the challenged regulation and those in place in other states." *Sorrell*, 272 F.3d at 112; *see also C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 406-07, 114 S. Ct. 1622, 1690 (1994) (O'Conner J., concurring) (quoting the language from *Healy* that the "practical effect" of the challenged statute "must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, [jurisdiction] adopted similar legislation," explaining that this is not a "hypothetical inquiry," and going on to discuss that because many jurisdictions were contemplating or enacting similar laws, the potential for conflict was high); *Brown-Forman*, 476 U.S. at 583-84, 106 S. Ct. at 2086-87 (explaining that proliferation of price affirmation laws made the likelihood that a seller would be subjected to inconsistent obligations in different states high). No such conflict has actually been shown here – Michigan is the only state with a unique-mark requirement. In addition, because of the "substantially similar" language in § 572a(10), if, in fact, other states adopted similar container deposit laws, the burden of which Plaintiff complains, would only be diminished.

Finally, the Court disagrees with Plaintiff's contention that the "substantially similar" language in the challenged provision creates a constitutional problem. The case on which Plaintiff relies, *National Solid Wastes Management Association v. Meyer*, 165 F.3d 1151 (7th Cir. 1999), is readily distinguishable. The statute challenged in that case prohibited the importation of solid waste from any other state unless the community from which the waste originated enacted an ordinance meeting Wisconsin's specifications for recycling. *Id.* at 1152. The unique-mark requirement, in contrast, does not condition entry into the Michigan market on a state's having enacted a Bottle Bill. All brands that meet the specified thresholds must have the mark § 572a(10) requires, regardless of

21

whether the bottle originates out-of-state or in-state and regardless of whether the state from which it originates has a Bottle Bill. The "substantially similar" language was simply designed to lessen the burden on interstate manufacturers in that a bottle marked in accordance with § 572a(10), can also be used in other states with "substantially similar" laws (i.e., other Bottle Bill States). Michigan's borders, however, are not closed to non-Bottle Bill states. Furthermore, unlike the Wisconsin statute, the Michigan statute in no way attempts to regulate the actual product (i.e., soft drink beverages) in any other state.

### 2. The *Pike* Balancing Test

Because the Court concludes that the statute is neither discriminatory nor extraterritorial, but instead regulates evenhandedly, it must move onto the second step of the inquiry, which is to apply the *Pike* balancing test. *Boggs*, 622. F.3d at 644. "That test upholds a state regulation unless the burden it imposes upon interstate commerce is 'clearly excessive in relation to the putative local benefits." *Id.* (citing *Pike*, 397 U.S. at 142, 90 S. Ct. at 847). "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 394 U.S. at 142, 90 S. Ct. at 847.

Plaintiff asserts that the unique-mark requirement imposes substantial burdens on interstate commerce because any company that wishes to do business both within and outside of Michigan must create duplicative production, bottling, and distribution operations. In addition, Plaintiff says, the statute deprives manufacturers of the ability to fluidly shift beverages into or out of Michigan in response to sudden changes in demand. This burden substantially outweighs the putative local benefit, which, according to Plaintiff, is merely to increase the State's escheat revenue. In fact,

22

Plaintiff contends, the extent of fraudulent redemption has not even been reliably documented. Finally, Plaintiff argues, the unique-mark requirement does nothing to prevent fraudulent returns to retailers who often do not examine bottles individually, and the problem could be adequately deterred in the following less-burdensome ways: (1) ban retailer redemption altogether and require the use of reverse vending machines for all refunds; (2) seriously enforcing the criminal penalties for improper redemption, including the newly created criminal prohibitions on retailer and distributor fraud; and (3) allocating retailers their share of escheated funds based, not upon the number of cans redeemed as it is now, but upon their anti-fraud efforts.

Defendants contend that the unique-mark requirement benefits Michigan by preventing fraudulent redemption, which, Defendants assert, is a well-documented problem.  Defendants also allege that the burden on interstate commerce is relatively minor.  In support, Defendants note that many of Plaintiff's members have already been complying with the law for approximately a year as have beer manufacturers (whose cans and bottles are similar to what Plaintiff's members use) and that even before the law was enacted, some industry members were voluntarily implementing unique-to-Michigan marking.  Moreover, Plaintiff's members may recoup any related costs in the form of higher prices to Michigan consumers.   As to Plaintiff's alternative solutions, Defendants assert that none would adequately resolve the problem.  Banning retailer redemption does nothing to combat fraudulent redemption using reverse vending machines.  Criminal penalties have already proven unsuccessful.  And, although allocating escheated funds to retailers based on their anti-fraud effort may help, it cannot fully combat the problem.  Finally, at a minimum, Defendants request additional discovery before the Court rules on the *Pike* balancing test regarding Plaintiff's members' labeling and distribution procedures as well as how, and at what expense, the affected industry members have been complying with the law.

With regard to the local benefit, although it has never been stated with precision how many bottles are fraudulently redeemed each year, Plaintiff does not deny that the problem exists, and Defendants have presented sufficient evidence that estimates the scope of fraud to be, conservatively, 10 million dollars per year. (*See* Defs.' Ex. 1A, 1B, and 1C.)  The parties' dispute about the purpose behind the statute – preventing criminal fraud versus increasing the State's escheat revenue – is not dispositive.  Although revenue generation is insufficient to justify a *discriminatory* statute, it is a cognizable benefit for purposes of the *Pike* balancing test.  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346, 127 S. Ct. 1786, 1798 (2007). Moreover, Plaintiff has cited no case, and the Court is aware of none, holding that a state does not have a legitimate interest in preventing an illegal activity simply because that illegal activity is one which has the primary effect of decreasing state revenue.  Finally, it is undisputed that the majority of the funds that are lost to fraudulent redemption each year would otherwise go into a cleanup and redevelopment trust fund.  Protecting the environment is a legitimate public benefit.  *See Maine v. Taylor*, 477 U.S. 131, 106 S. Ct. 2440 (1986).

With regard to the burden on interstate commerce, Plaintiff presents affidavits which describe logistical difficulties in production and warehousing that manufacturers face in order to comply with the statute and describe them as "costly."  Although several of Plaintiff's members have been complying with the law for approximately a year,  the Court has no concrete idea of the actual costs this has imposed on any individual manufacturer or on the interstate market as a whole.  In addition, the case on which Plaintiff relies for support that the burden on interstate commerce is substantial,  *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 79 S. Ct. 962 (1959), involved

24

interstate transporters and is, therefore, distinguishable.[4]  *See Sorrell*, 272 F.3d at 111-12 (distinguishing cases involving interstate transporters from the issues presented with a labeling restriction).  "Transporters forced either to abide by state rules or avoid the state entirely would necessarily be impeded, if they chose the latter course, in their effort to conduct commerce with the surrounding states because they would be unable to pass through the regulating state."  *Id.*  Here, in contrast, Plaintiff's members may simply choose not to do business in Michigan or may pass the cost onto Michigan consumers in the form of higher prices.  *See id.*; *see also Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 128, 98 S. Ct. 2207, 2215 (1978) ("It may be true that the consuming public will be injured by the [effect of the challenged regulation], but again that argument relates to the wisdom of the statute, not to its burden on commerce.").

In attempting to weigh the burdens and benefits, therefore, it is not clear whether the burden on interstate commerce is "clearly excessive" in relation to the local benefits.  The Court does not doubt that the unique-mark requirement places some burden on Plaintiff's members, but the scope of that burden remains unclear.  The Court is also not prepared to say, however, that as a matter of law, the unique-mark requirement is constitutional.   Instead, the Court finds that a genuine issue of material fact exists as to the extent of the burden that M.C.L. § 445.572a(10) imposes on interstate commerce.

## CONCLUSION

For the reasons set forth above, the Court will:

(1)     grant summary judgment in favor of Defendants as to the Court's conclusion that

M.C.L. § 445.572a(10) is neither discriminatory nor extraterritorial.

---

[4] The statute challenged in *Bibb* required the use of a certain type of mudguard on all trucks and trailers operated on Illinois highways.  As a result, conventional mudguards that were legal or even required in at least 45 other states, were illegal in Illinois. 359 U.S. at 523, 79 S. Ct. at 964.  The Court found the statute, although nondiscriminatory, was unduly burdensome on interstate motorcarriers.  *Id.* at 529-30, 79 S. Ct. at 967-68.

25

(2)     decline to enter summary judgment with regard to the *Pike* balancing test, finding

that material questions of fact remain regarding the extent of the burden that M.C.L.

§ 445.572a(10)  places on interstate commerce.

(3)     grant summary judgment in favor of Plaintiff on Defendants' defense of laches.

(4)     grant summary judgment in favor of Plaintiff on Defendants' defense of unclean

hands.

(5)     grant summary judgment in favor of Plaintiff on Defendants' defense that the Court

should decline to issue a declaratory ruling.

(6)     deny summary judgment at this time on Defendants' defense that Plaintiff has failed

to establish a right to injunctive relief as it remains to be seen whether the statute is

unconstitutional under *Pike*.

A separate Order will issue.


Dated:  May 31, 2011                                    _____/s/ Gordon J. Quist_____
                                                                       GORDON J. QUIST
                                                          UNITED STATES DISTRICT JUDGE